UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
- - - - - - - - - - - - - -

UNITED STATES OF AMERICA,           No.2:04:CR:6

          Plaintiff,

                                  Hon. David W. McKeague
    v.                            United States District Judge

CORNELIUS COE,

          Defendant.

_____/

## <u>TRIAL BRIEF FOR THE UNITED STATES</u>

The United States of America, by and through its attorneys, Margaret M. Chiara, United

States Attorney for the Western District of Michigan, and Brian P. Lennon, Assistant United

States Attorney, presents this Court with the following trial brief.

## I.  <u>The Pending Charges.</u>

The Second Superseding Indictment in this case alleges eight counts.  Count One charges

Defendant Cornelius Coe with conspiracy to distribute and possess with intent to distribute 50

grams or more of cocaine base ("crack") in Marquette, Michigan, and elsewhere.  Count Two

charges Defendant Coe with conspiracy to distribute and possess with intent to distribute 500

grams or more of cocaine in Marquette, Michigan, and elsewhere.  Count Three charges the

Defendant with distributing and/or aiding and abetting Russell Ryan in the distribution of cocaine

in Marquette on or about February 11, 2004.  Count Four charges the Defendant with distributing

and/or aiding and abetting Lacey Setner in the distribution of cocaine in Marquette on or about

January 9, 2004.  Counts Five through Seven charge Defendant Coe with distribution of cocaine

in Marquette on October 10, 2002, October 1, 2002, and September 19, 2002, respectively. Count Eight is a forfeiture allegation.

## II. **The Cocaine Base and Cocaine Conspiracies**.

### A. **Generally.**

From an unknown date in 1998 through February 2004, Cornelius Coe was responsible for distributing significant amounts of cocaine base (crack) and cocaine in the Marquette and Munising areas of Michigan's Upper Peninsula. Defendant Coe obtained the crack and cocaine from friends and others in Chicago, Illinois, and distributed the cocaine to his friends and others in Marquette and Munising, including high school-aged students and students at Northern Michigan University.

In the United States' case-in-chief, we intend to present the testimony of at least 20 witnesses who, at various times during the course of the conspiracy, obtained cocaine and/or cocaine base directly from Cornelius Coe for resale to others. These witness will testify about the quantities of crack and/or cocaine that they obtained from the Defendant, the financial arrangements they made with Defendant Coe, and, in some cases, Coe's efforts to avoid detection by law enforcement and ultimately, prosecution. Some of these witnesses will explain how the Defendant recruited them first as drug customers before urging them to become dealers by offering them controlled substances "on the front," and teaching them how to increase their sales and profits. Defendant Coe's home and mobile telephone records will corroborate the testimony of many of these witnesses, whom Defendant Coe called repeatedly at various times during the course of the conspiracy.

Unbeknownst to Defendant Coe, several of these customers/dealers became police informants. Three of these witnesses will testify about recorded drug-related conversations they had with Defendant Coe.

**B.    September 5, 1998 Traffic Stop.**

On or about September 5, 1998, on US-41 near Ispeming, Michigan, Michigan State Police Troopers stopped a black Ford Mustang driven by Defendant Coe. Marijuana seeds and stems, along with $11,800 in U.S. currency, were found in the vehicle. The money was divided into 118 separate stacks of large bills. Each stack contained $100 and was covered in plastic bubble-wrap and secured with white athletic tape. When questioned by the police, Defendant Coe admitted that the money was his, but he could not tell the Trooper how much money was in the car. The money was subsequently placed in a state police cruiser when a state police drug dog arrived on the scene with its handler. The drug dog "hit" on the black Ford Mustang and found the bundles of Defendant Coe's money hidden in the state police cruiser.

**C.    Traffic Accident on December 19, 1999 & Discovery of Cocaine on April 20, 2000.**

On December 19, 1999, a Michigan State Police Trooper responded to a single-car accident in or near Au Train, Michigan, which is located between Marquette and Munising. The Trooper found Defendant Coe, who told the Trooper that he hit a patch of ice and lost control of his vehicle, a 1999 Ford Expedition. The Trooper noticed footsteps in the snow leading away from Defendant Coe's vehicle and heading towards the Au Train River before circling back to the vehicle. The Trooper followed the tracks in the snow, but because of the lighting and weather conditions, he was unable to thoroughly search the area.

On April 24, 2000, after the snow melted, the Trooper returned to the location where the accident occurred, and he retraced his steps. The Trooper located a substance he recognized as cocaine. Chemical analysis of the substance confirmed the presence of cocaine with a weight of 14.9 grams. No usable fingerprints, however, were lifted from the baggie.

**D.     January 8, 2000 State Search Warrant at 346 Harrison, Marquette, Michigan.**

In the early morning hours of January 8, 2000, officers assigned to the Michigan State Police Department's Upper Peninsula Substance Enforcement Team (UPSET), executed a state search warrant at 346 Harrison, Marquette, Michigan, the home of Cornelius Coe. Among other items of evidence seized, police found a substantial amount of U.S. currency, a scale, and a small amount of marijuana in the residence. Moreover, under a piece of carpet on Defendant Coe's back step police found a distribution quantity of suspected cocaine. Chemical analysis confirmed the presence of cocaine and a total weight of 8 grams. Several government witnesses will testify that, from time to time, Defendant Coe left cocaine for them outside his residence and/or directed them to retrieve cocaine from areas just outside his residence at 346 Harrison, Marquette, Michigan. At least two witnesses will testify that they purchased cocaine directly from Defendant Coe at his residence hours before the police executed their search warrant.

At the time of the search, Defendant Coe and his girlfriend, Lacey Setner, both denied any knowledge of the drugs. Ms. Setner, who is the mother of one of Defendant Coe's children, is expected to testify for the government.

As a result of the search warrant, Defendant Coe was charged in Marquette County Circuit Court with possession with intent to distribute cocaine. Shortly before the trial, Coe tried to influence the testimony of Jonathan St. Martin and Coe's girlfriend, Lacey Setner. Mr. St.

Martin testified for the state in Defendant Coe's state court trial. Ms. Setner was expected to testify for the defense, but she ultimately was not called to the witness stand. Both Ms. Setner and Mr. St. Martin will testify that Defendant Coe attempted to influence their expected state court trial testimony.

**E.      October 2000 Trial: *People of the State of Michigan v. Cornelius Coe*.**

In October 2000, Cornelius Coe was tried in state court and testified in his own behalf. Defendant Coe's testimony included admissions of his home and mobile telephone numbers, and he acknowledged that numerous telephone calls were made from his home and mobile telephone numbers to many of the witnesses who will testify against him in this case, including Jonathan St. Martin and Lyndsey Beauchamp. At his state court trial, Defendant Coe claimed that the $11,800 found in the black Ford Mustang was from "overage" checks from Northern Michigan University, profits from parties he threw, and from mowing lawns. Defendant Coe denied any knowledge of the cocaine and marijuana found in his home, and surmised that the drugs must have been left by his former roommate, Charles Nathaniel Edgecombe. Mr. Edgecombe, who is a convicted felon and friend of Defendant Coe, will testify in this case. Among other expected testimony, Mr. Edgecombe will deny knowledge and/or ownership of the drugs found at Defendant Coe's residence on January 8, 2000.

Defendant Coe's testimony during his state court trial is admissible in this case, pursuant to Federal Rules of Evidence 801(d)(2) and 1007.

Witnesses also will testify that Defendant Coe resumed his distribution of controlled substances shortly after he was acquitted of the state court charge, and he continued distributing

cocaine base and cocaine in the Northern Division of the Western District of Michigan until mid-February 2004.

### III.  **The 2002 Cocaine Distribution Charges**.

In 2002, UPSET developed several informants who were debriefed about their drug-related activities with Defendant Coe.  Some of these informants agreed to make recorded telephone calls to Defendant Coe and/or controlled purchases of cocaine from him.

On April 25, 2002, a government witness named Jay Hartwell called Defendant Coe on the telephone and made arrangements to deliver $400 of UPSET funds to Defendant Coe. Government Exhibit #6 is a series of recorded telephone conversations during which Defendant Coe instructs Mr. Hartwell to deliver the money to Coe's girlfriend, Lacey Setner, at 342 Whetstone, Apartment #3, Marquette, Michigan.  While Defendant Coe characterizes the money as repayment for a "loan" to Mr. Hartwell, Mr. Hartwell will testify that the money was partial payment for a crack debt he owed the Defendant.  Ms. Setner is expected to testify that she collected money for Defendant Coe from Mr. Hartwell and others.

In the Fall of 2002, another cooperating individual named Heidi Schwan made several controlled purchases of cocaine from Defendant Coe and a number of Defendant Coe's co-conspirators, including Jermaine Collins and Russell Ryan.  Along with Heidi Schwan, both Russell Ryan and Jermaine Collins will testify about their drug-related activities with Defendant Coe in the Fall of 2002.

**A.      Controlled Purchases of Cocaine From Defendant Coe in September and October 2002.**

Counts Five through Seven of the Second Superseding Indictment charge Defendant Coe with distributing a quantity of cocaine in Marquette on specified dates in September and October 2002.  These controlled deliveries were made by Defendant Coe to Heidi Schwan, hand-to-hand. All these controlled deliveries were observed by UPSET detectives, who saw Defendant Coe meet with Ms. Schwan at various locations around Marquette.  Ms. Schwan, who was throughly searched by police before meeting with Defendant Coe, handed over to UPSET detectives the cocaine she received each time from Defendant Coe.  Some of these controlled purchases were recorded.

Ms. Schwan will authenticate one such tape recording marked as Government Exhibit 7, wherein Defendant Coe tells her, among other things, that the stuff he has is "the hard," and he asks her whether she knows of anybody who wanted "the hard."  Ms. Schwan and other witnesses will testify that the term "hard" means crack cocaine, as opposed to powder cocaine.

**B.      Controlled Purchases of Cocaine on January 19, 2004 and February 11, 2004.**

In late December 2003 or early January 2004, UPSET identified Joel Cearley as someone who they suspected was receiving cocaine from Defendant Coe and distributing the cocaine in the Munising, Michigan area.  Mr. Cearley's name had come to law enforcement's attention after the January 8, 2000 search of Defendant Coe's residence in Marquette, but by the time Defendant Coe was prosecuted in state court, Mr. Cearley had left the area.  Knowing that Mr. Cearley was back in the Munising area, UPSET detectives approached him and questioned him about his drug-related activities with Defendant Coe.  Mr. Cearley admitted that he had just recently

resumed his drug relationship with Defendant Coe, and Mr. Cearley agreed to work with UPSET by making telephone calls to and controlled purchases from Defendant Coe.

1. ***Count Four - Distribution and Aiding and Abetting the Distribution of Cocaine on January 9, 2004.***

In late 2003 or early January 2004, before Defendant Coe left the Marquette area to report to his Arena Football team in Los Angeles, California, Mr. Cearley, arranged to pick up an ounce of cocaine from Defendant Coe's business, the VIP Salon in Marquette. The arrangements made by Defendant Coe were for Mr. Cearley to meet Lacey Setner at the VIP Salon, where Mr. Cearley was to give Ms. Setner some money owed for a past drug debt, and Ms. Setner was to provided Mr. Cearley with the cocaine.

Ms. Setner is expected to testify that before Defendant Coe left for his Arena Football team's training camp, he gave her a shoebox containing athletic shoes, and he told her that someone named "Joel" was going to come to the VIP Salon, where Ms. Setner worked, to pick up the shoes. Ms. Setner will testify that she suspected there was cocaine in the shoe box, so after Defendant Coe left, she looked in the box and found an ounce of cocaine. Ms. Setner will testify that she took some of the cocaine, which she kept for personal use.

Both Ms. Setner and Mr. Cearley will testify about the following events of January 9, 2004: (1) that Mr. Cearley meet Ms. Setner at the VIP Salon; (2) that Mr. Cearley gave Ms. Setner $500 of the money he owed Defendant Coe; and (3) that Ms. Setner gave Mr. Cearley the shoebox containing the shoes and cocaine. A recording of the January 9, 2004 controlled delivery is marked as Government Exhibit #8. Both Ms. Setner and Mr. Cearley can authenticate the recording.

The government, through Mr. Cearley, intends to introduce into evidence a series of tape recorded telephone calls, marked as Government Exhibit #9, between Defendant Coe and Mr. Cearley, following this January 9, 2004 controlled purchase. During the initial telephone call, Mr. Cearley tells Defendant Coe that the cocaine he received from Ms. Setner was "5 grams light." After Defendant Coe confirms that Mr. Cearley paid Ms. Setner $500, and that the product he received was "5 light," Defendant Coe says, "I'll get some decent numbers together, then I'll call you back later and let you know. Don't worry about it." Mr. Cearley will testify that Defendant Coe called him back and adjusted his debt down to $1,500.

2. ***Count Three - Distribution and Aiding and Abetting the Distribution of Cocaine on February 11, 2004.***

In early February 2004, Mr. Cearley, at the direction of UPSET, called Defendant Coe and made arrangements to travel to Marquette to pick up more cocaine at the VIP Salon. Defendant Coe tells Mr. Cearley that his "cousin" will be there to give him a few "products for (his) girlfriend," or words to that effect. Mr. Cearley will testify that on February 11, 2004, while working with UPSET detectives, he made a controlled purchase of 157 grams of cocaine from Russell Ryan. After Mr. Ryan provided Mr. Cearley with the cocaine, Mr. Cearley gave Mr. Ryan $2,700 of pre-recorded UPSET funds. Shortly after the transaction, Mr. Cearley meet with the detectives and turned over to them the 157 grams of cocaine.

A state search warrant was then executed at the VIP Salon. Mr. Ryan was arrested, and the $2,700 of pre-recorded UPSET funds were found in Lacey Setner's purse. Mr. Ryan immediately began cooperating with law enforcement and told them that he traveled to Marquette at the direction of Defendant Coe. Mr. Ryan told police that while living with Mr.

Coe's family in the Chicago area, he was contacted by Defendant Coe and instructed as to where to obtain the cocaine for delivery to Marquette. Mr. Ryan is expected to testify that he arrived in Marquette by bus and was instructed by Defendant Coe to meet Mr. Cearley at the VIP Salon, but to complete the drug transaction outside the salon. The controlled purchase of cocaine on February 11, 2004 was recorded by UPSET and has been marked as Government Exhibit #11.

## IV. Elements Of The Offenses.

### A. The Conspiracy Charges.

In order to convict a defendant of conspiracy to possess with intent to distribute and to distribute a controlled substance under 21 U.S.C. § 846, the Government is required to prove the following essential elements: "(1) an agreement by two or more people to violate the drug laws, and (2) each conspirator 'knew of, intended to join and participated in the conspiracy.'" United States v. Elder, 90 F.3d 1110, 1120 (6th Cir. 1996) (quoting United States v. Phibbs, 999 F.2d 1053, 1063 (6th Cir.1993)). The government need not allege or prove any overt acts in furtherance of a conspiracy charged under Title 21. United States v. Nelson, 922 F.2d 311 (6th Cir.1990). The government may prove the existence of the conspiracy through circumstantial evidence alone, such as through evidence of multiple transactions, large quantities of drugs and delayed payment arrangements. See United States v. Nesbitt, 90 F.3d 164, 167 (6th Cir. 1996); United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir. 1986), aff'd, 483 U.S. 171 (1987). As for the knowledge of each defendant, the government need not prove that each member of the conspiracy participated in all of its aspects, was aware of every act of the co-conspirators, or of all of the details of the conspiracy. United States v. Barrett, 933 F.2d 355, 359 (6th Cir. 1991); United States v. Hughes, 895 F.2d 135, 1140 (6th Cir. 1990). The government need only show

that each member agreed to participate in what he or she knew to be a collective venture directed toward a common goal.  United States v. Ghazaleh, 58 F.3d 240, 245 (6th Cir. 1995).

A defendant may claim that he or she was part of some smaller sub-conspiracy rather than the charged conspiracy; but the mere fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more than one conspiracy as long as the different sub-groups are committing acts in furtherance of one overall scheme or plan.  See United States v. Rugiero, 20 F.3d 1387, 1392 (6th Cir. 1994).

A defendant may also claim he or she withdrew from the conspiracy, such as due to an arrest in the course of the conspiracy.  However, once a defendant joins a conspiracy, his or her continued participation is presumed unless he or she undertook affirmative acts to abandon the enterprise and its goals.  See United States v. Chambers, 944 F.2d 1253, 1265 (6th Cir. 1991); United States v. Ramos, 861 F.2d 461, 465 (6th Cir. 1988).

Where the government charges that the conspiracy involved more than one object, such as to distribute more than one type of drug, the government may prove its case by proving either or both objects.  See Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466 (1991);  United States v. Munoz, 233 F.3d 410, 413 (6th Cir. 2000).  Here, the Second Superseding Indictment alleges two separate conspiracies.  Count One alleges a conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base ("crack"), and Count Two alleges a conspiracy to possess with intent to distribute and to distribute 500 kilograms or more of cocaine.  The maximum statutory penalty for Count One is life in prison, see 21 U.S.C. § 841(b)(1)(A), while the maximum penalty for Count Two is 40 years.  See 21 U.S.C. § 841(b)(1)(B).

Since the Supreme Court's decision in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348 (2000), the quantity of a drug alleged in a controlled substance charge qualifies as an equivalent of an element of the charged offense if that quantity increases the statutory maximum penalty. For a conspiracy charge under Title 21 that alleges a quantity of a drug leading to a statutory maximum penalty higher than that for trace amounts of the drug, the government must prove the conspiracy *"as a whole"* involved the statutory threshold quantity alleged in the charge. <u>Derman v. United States,</u> 298 F.3d 34, 43 (1st Cir. 2002)(emphasis original); <u>accord,</u> <u>United States v. Phillips,</u> 349 F.3d 138, 142 (3d Cir. 2003); <u>United States v. Knight,</u> 342 F.3d 697, 710 (7th Cir. 2003); <u>United States v. Munoz,</u> 324 F.3d 987, 991 (8th Cir. 2003); <u>United States v. Turner,</u> 319 F.3d 716, 722-23 (5th Cir. 2003); <u>United States v. Allen,</u> 65 Fed.Appx. 476, 480, 2003 WL 21259905, *4 (4th Cir. 2003). <u>See</u> Fifth Circuit Pattern Jury Instruction §2.89. Thus, the government in this case must prove that the conspiracy in Count One, as a whole, involved 50 grams or more of cocaine base, and that the conspiracy in Count Two, as a whole, involved 500 grams or more of cocaine because these are the quantities alleged in the Second Superseding Indictment and these quantities each lead to a maximum penalty of "life" for Count One and forty years for Count Two, both of which are higher than the default maximum penalty for each drug - 20 years for trace amounts of cocaine and cocaine base.

The government *need not* prove that every member of the conspiracy knew of or was directly involved in a threshold amount or even knew the exact type of controlled substance that was the subject of his or her conspiratorial agreement. <u>See</u> <u>Derman,</u> 298 F.3d at 43; <u>accord,</u> <u>Phillips,</u> 349 F.3d at 142; <u>United States v. Knight,</u> 342 F.3d at 710; <u>Munoz,</u> 324 F.3d at 991; <u>Turner,</u> 319 F.3d at 722-23; <u>Allen,</u> 65 Fed.Appx. at 480, 2003 WL 21259905, *4. <u>See</u> <u>also</u>

United States v. Alvarez, 266 F.3d 587, 594 (6th Cir. 2001)("Drug defendants may be sentenced and held accountable for an amount of contraband representing less than the complete scope of the conspiracy."); United States v. Willis, 59 Fed. Appx. 40, 2003 WL 247115 at **3 (6th Cir. 2003).[1] If the jury returns a verdict of less than the amount alleged in Count One and Two of the Second Superseding Indictment, then the verdicts will be for the equivalent of lesser-included offenses.

Once the jury has determined the quantity of drugs involved in each alleged conspiracy *"as a whole"* and has found the defendant guilty of participation in the conspiracy, "the judge lawfully may determine the drug quantity attributable to that defendant and sentence him accordingly (so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination)." Derman, 298 F.3d at 43; accord, Phillips, 349 F.3d at 142; United States v. Knight, 342 F.3d at 710; Munoz, 324 F.3d at 991; Turner, 319 F.3d at 722-23; Allen, 65 Fed.Appx. at 480, 2003 WL 21259905, *4.

---

[1] "Apprendi ... require[s] that the type and quantity of drug at the heart of a conspiracy be proven beyond a reasonable doubt before a conviction mandating sentencing ranges based on those factors can be sustained. *Apprendi did not alter the basic law of conspiracy, however.* Thus, while the government must establish (1) that the purpose *of the conspiracy* involved a particular type of drug, and (2) an approximate quantity of that particular drug, *it remains true that the government need not establish that each conspirator understood the precise purposes and objects of the illegal agreement.* Here, Willis (1) acknowledged that he knew the purpose of the conspiracy was to possess with intent to distribute, and to distribute, *illegal substances*; and (2) stipulated that, at trial, the government could prove both that the illegal substance actually delivered was cocaine, and that the amount of cocaine intended for delivery to Willis exceeded 500 grams. That is all the proof required for Count I, even post-Apprendi." Willis, 59 Fed. Appx. 40, 2003 WL 247115 at **3 (emphasis added).

**B.	The Distribution Charges.**

Counts Three through Seven charge Defendant Coe with distributing a quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The elements of this offense are (1) that the defendant distributed (2) a quantity of something he knew was a controlled substance, which is cocaine in this case, and (3) that it was defendant's intent – his conscious objective – to distribute the drug. See First Circuit Pattern Jury Instruction 4.23; Eighth Circuit Pattern Instruction 6.21.841B.

**C.	Counts Three and Four - Aiding and Abetting the Distribution of Cocaine.**

In Counts Three and Four, the Government also alleges that Defendant Coe aided and abetted others in the distribution of cocaine on February 11, 2004 and January 9, 2004. Title 18, United States Code, Section 2 states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principle." 18 U.S.C. § 2(a).

Sixth Circuit Pattern Jury Instruction § 4.01 states:

> (1) For you to find the defendant guilty of [Counts Three and Four], it is not necessary for you to find that he personally committed the crime himself. You may also find him guilty if he intentionally helped or encouraged someone else to commit the crime. A person who does this is called an aider and abettor.

> (2) But for you to find the defendant guilty of [Counts Three and Four], as an aider and abettor, you must be convinced that the government has proved each and every one of the following elements beyond a reasonable doubt:

>> (A) First, that the crime of distribution of cocaine was committed;

>> (B) Second, that the defendant helped to commit the crime or encouraged someone else to commit the crime;

(C) And third, that the defendant intended to help commit
or encourage the crime.

(3) Proof that the defendant may have known about the crime, even
if he was there when it was committed, is not enough for you to
find him guilty. You can consider this in deciding whether the
government has proved that he was an aider and abettor, but
without more it is not enough.

(4) What the government must prove is that the defendant did
something to help or encourage the crime with the intent that the
crime be committed.

(5) If you are convinced that the government has proved all of
these elements, say so by returning a guilty verdict. If you have a
reasonable doubt about any one of these elements, then you cannot
find the defendant guilty as an aider and abettor.

U.S. Sixth Circuit District Judges Association, <u>Pattern Criminal Jury Instructions</u>, 4.01 (1991).

## V.  <u>Legal Issues For Trial</u>.

The government expects the following legal issues at trial.

## A.    **Admissibility of Defendant Coe's Statements Recorded By Confidential Informants.**

The United States intends to introduce several tape recorded conversations between

confidential informants working for UPSET and Defendant Coe.  Without question, Defendant

Coe's statements are admissible against him, as they are admissions of a party opponent under

Federal Rule of Evidence 801(d)(2)(A).  <u>See</u> <u>United States v. Haun</u>, 90 F.3d 1096, 1102 (6th Cir.

1996). The United States anticipates that Defendant Coe will object to the admission of the tape

recordings themselves and the transcripts prepared by the Government.

### 1. *The Tape Recordings Will Be Properly Authenticated.*

Rule 901(a) of the Federal Rules of Evidence provides that "[t]he requirement of

authentication . . . is satisfied by evidence sufficient to support a finding that the matter in

15

question is what its proponent claims." Fed. R. Evid. 901(a). In <u>United States v. Lance</u>, 853 F.2d 1177 (5th Cir. 1988), the government offered tape recordings through a testifying co-conspirator who made the tapes while acting as an informant. The defendants challenged the admission of the tape recordings, alleging that the government failed to adequately authenticate them. The court held that under Rule 901, the witness, as well as those law enforcement officers who were present for the disputed conversations, had the requisite knowledge to testify that the tapes contained accurate recordings of the conversations. The court also stated that the defense objections "concerned the weight, not the admissibility, of the tapes." <u>Lance</u>, 853 F.2d at 1182.

In this case, the Government intends to authenticate the tape recorded conversations using the confidential informants who made the tape recordings and/or UPSET detectives who monitored the conversations. These witnesses will then be subject to cross-examination by the defense.

**2.** ***The Tape Recorded Conversations Are "Audible and Sufficiently Comprehensible.***"

To be admissible, a tape recorded conversation must be "'audible and sufficiently comprehensible for the jury to consider the contents.'" <u>United States v. Wilkinson</u>, 53 F.3d 757, 761 (6th Cir. 1995) (quoting <u>United States v. Robinson</u>, 707 F.2d 872, 876 (6th Cir. 1983)). "The district court abuses its discretion only 'where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy.'" <u>United States v. Scarborough</u>, 43 F.3d 1021, 1024 (6th Cir. 1994) (quoting <u>United States v. Scaife</u>, 749 F.2d 338, 345 (6th Cir. 1984)); <u>see</u> <u>United States v. Powers</u>, 75 F.3d 335, 341 (7th Cir. 1996) (A recording that is partially audible or unintelligible is admissible unless the inaudible portions are "so substantial as to render the recording as a whole untrustworthy."). The government contends that

the tape recorded telephone conversations between Defendant Coe and confidential informants Jay Hartwell, Heidi Schwan, and Joel Cearley are "audible and sufficiently comprehensible for the jury to consider the contents."  Wilkinson, 53 F.3d at 761.

Moveover, to the extent that the transcripts differ from the tapes themselves, the Sixth Circuit Pattern Jury Instruction instructs the jurors that the transcripts are not evidence but are given to them as a "guide to help [them] follow what was being said."  U.S. Sixth Circuit District Judges Association, Pattern Criminal Jury Instructions, 7.17 (1991) "If [jurors] notice[] any differences between what [they] heard on the tapes and what [they] read in the transcripts, [they] must rely on what [they] heard, not what [they] read.  And if [they] could not hear or understand certain parts of the tapes, [they] must ignore the transcripts as far as those parts are concerned." Id.

**B.    Co-Conspirator Statements**.

Some of the United States' evidence in this case may involve statements of alleged coconspirators.  Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if the statement is offered against a party and is "a statement by a coconspirator of a party during the course of and in furtherance of the conspiracy."  Although this is commonly referred to as the coconspirator exception to the hearsay rule, see, e.g., United States v. Howard, 770 F.2d 57, 59 (6th Cir. 1985) (en banc), cert. denied, 475 U.S. 1022 (1986), the rule expressly provides that such statements are not hearsay.  See United States v. Brown, 555 F.2d 407, 422 n.35 (5th Cir. 1977), cert. denied, 435 U.S. 904 (1978).  The Supreme Court has held that such statements do not violate the Sixth Amendment's confrontation clause, even if the declarant is not available. United States v. Inadi, 475 U.S. 387 (1986).

In order to establish a foundation for admissibility of statements under this rule, the United States must show that (1) a conspiracy existed, (2) the defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy.  United States v. Vinson, 606 F.2d 149 (6th Cir. 1979), cert. denied, 444 U.S. 1074 (1980).  These requirements must be established by a preponderance of the evidence.  United States v. Bourjaily, 781 F.2d 539, 542 (6th Cir. 1986), aff'd, 483 U.S. 171 (1987); United States v. Enright, 579 F.2d 980, 986 (6th Cir. 1978).  "(I)f it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy, the hearsay is admissible."  Id.  This determination is made by the trial court, not the jury, under Fed. R. Evid. 104(a).  Id.  In making this determination, the court may take into consideration the proposed statements themselves.  Bourjaily, 483 U.S. 171 (1987); United States v. Hancock, 703 F.2d 982 (6th Cir. 1983); Vinson, 606 F.2d at 153.  Once the requirements for admissibility under Fed. R. Evid. 801(d)(2)(E) have been met, statements by one conspirator are treated as vicarious admissions by all members of the conspiracy, United States v. Kendricks, 623 F.2d 1165, 1167-68 (6th Cir. 1980).  It is not necessary for a conspiracy to be charged in order for the coconspirator "exception" to apply.  Evidence may be charged in the indictment, especially where there is a charge of aiding and abetting.  United States v. Ayotte, 741 F.2d 865 (6th Cir. 1984), cert. denied, 469 U.S. 1076 (1984).

In Vinson, the Sixth Circuit set forth three alternative methods of establishing the requirement for admissibility under Fed. R. Evid. 801(d)(2)(E):

1. The court, without a jury, may hold a pretrial "mini-hearing" in which the government presents its proof of conspiracy and the court makes a preliminary <u>Enright</u> finding;

2. The court may require the government to meet its initial burden by producing the non-hearsay evidence of conspiracy at trial prior to making an <u>Enright</u> finding;

3. The court may admit the coconspirator statements conditionally, subject to the government establishing the <u>Enright</u> requirements prior to the close of its proofs;

<u>Vinson</u>, 606 F.2d at 152-53. The United States urges the court to employ method 3, which has been repeatedly approved by the Sixth Circuit. <u>See</u> <u>United States v. Christian</u>, 786 F.2d 203, 212 (6th Cir. 1986); <u>Bourjaily</u>, 781 F.2d at 542; <u>United States v. Holloway</u>, 731 F.2d 378, 382 (6th Cir.), <u>cert</u>. <u>denied</u>, 469 U.S. 1021 (1984).

In order to be admissible under Fed. R. Evid. 801(d)(2)(E), the statements must be made in the course of, and in furtherance of, the conspiracy. These requirements were discussed at length in <u>United States v. Hamilton</u>, 689 F.2d 1262 (6th Cir. 1982), <u>cert</u>. <u>denied</u>, 459 U.S. 1117 (1983).

In regard to the "in the course of" requirement, the <u>Hamilton</u> court quoted from <u>United States v. Mayes</u>, 512 F.2d 637, 642-43 (6th Cir.), <u>cert</u>. <u>denied</u>, 422 U.S. 1008 (1975), as follows:

[W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has been terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn.

<u>Hamilton</u>, 689 F.2d at 1268. The burden is on the defendant to affirmatively prove either that the conspiracy had been abandoned or that he had withdrawn.

A statement is made "in furtherance of" the conspiracy if it was intended to promote the conspiratorial objective. Hamilton, 689 F.2d at 1270. It need not actually further the conspiracy to be admissible. Id. In determining whether the "in furtherance" requirement has been met, courts have generally construed the term broadly. United States v. Gibbs, 739 F.2d 838, 845 (3d Cir. 1984), cert. denied, 469 U.S. 1106 (1985); United States v. Trotter, 529 F.2d 806, 813 (3d Cir. 1976); United States v. James, 510 F.2d 546, 549 (5th Cir.), cert. denied, 423 U.S. 855 (1975). As the Fifth Circuit stated in James, "Although this phrase has a talismanic ring to it, we must not apply the standard too strictly, lest we defeat the purpose of the exception." James, 510 F.2d at 549. The Court may consider the nature of the statements as well as the time and circumstances under which the statements were made in order to determine whether they were in furtherance of the conspiracy. United States v. Handy, 668 F.2d 407 (8th Cir. 1982). The Sixth Circuit has noted that where the admissibility of coconspirators' statements presents a close call, the district court's findings should not be disturbed. Hamilton, 689 F.2d at 1270-71.

The following are examples of statements which have been found to be "in furtherance of" various conspiracies: statements made to induce someone to join or remain in the conspiracy, United States v. Xheka, 704 F.2d 974 (7th Cir.), cert. denied, 464 U.S. 993 (1983); statements identifying other conspirators and their roles in the conspiracy, United States v. Hitow, 889 F.2d 1573, 1581 (6th Cir. 1989); United States v. Magee, 821 F.2d 234, 244 (5th Cir. 1987); statements made to inform other conspirators of the activities or status of the conspiracy, Hitow, 889 F.2d at 1581; United States v. Rios, 842 F.2d 868, 874 (6th Cir. 1988), cert. denied, 109 S.Ct. 840 (1989); instructions to other conspirators or discussions of future criminal intent, United States v. Layton, 720 F.2d 548 (9th Cir. 1983), cert. denied, 465 U.S. 1069 (1984); United

States v. Provenzano, 620 F.2d 985 (3d Cir.), cert. denied, 449 U.S. 899 (1980); Hamilton, 689 F.2d 1262 (6th Cir. 1982), cert. denied, 459 U.S. 117 (1983); statements to reassure others or alleviate concern, United States v. Rios, 842 F.2d 868, 874 (6th Cir. 1988), cert. denied, 109 S. Ct. 840 (1989); Gibbs, 739 F.2d at 846; United States v. Eaglin, 571 F.2d 1069, 1083 (9th Cir. 1977), cert. denied, 435 U.S. 906 (1978); United States v. James, 510 F.2d at 549-50; statements as to the source or purchaser of controlled substances, Hitow, 889 F.2d 1573, 1581 (6th Cir. 1989); United States v. Patton, 594 F.2d 444, 447 (5th Cir. 1979); conversations designed to collect money, Rios, 842 F.2d at 874; Hamilton, 689 F.2d at 1270; and statements of attempts to conceal the existence of the conspiracy where the object of the conspiracy has not been attained or abandoned, United States v. Howard, 770 F.2d 57, 61 (6th Cir. 1985) (en banc).

The coconspirators exception is not limited to oral statements. It may also include documents prepared during the course of and in furtherance of the conspiracy. See e.g., United States v. Diez, 515 F.2d 892, 899-900 (5th Cir. 1975), cert. denied, 423 U.S. 1052 (1976) (work papers of coconspirator accountant admissible as coconspirator statement or business records).

## C.    Background Information

The United States will offer background information as to events which led up to the investigation of this matter. This information will include testimony by law enforcement officers as to the reason and purpose of their arrests of certain coconspirators. No specific act will be detailed unless defense counsel requests more specificity. See United States v. Levy, 904 F.2d 1026, 1030 (6th Cir. 1990); United States v. Martin; 897 F.2d 1368 (6th Cir. 1990); United

States v. Freeman, 816 F.2d 558, 563 (10th Cir. 1987); United States v. Love, 767 F.2d 1052, 1063 (4th Cir. 1985), cert. denied, 474 U.S. 1081 (1986).

Such information is not offered for the truth of the matter asserted, but rather as relevant background information, and is therefore not inadmissible hearsay. United States v. Levy, 904 F.2d at 1030; Freeman, 816 F.2d at 563; Love, 767 F.2d at 1063. "(A)n out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken." Love, 767 F.2d at 1063. See also Freeman, 816 F.2d at 563.

"The jury is entitled to know the 'setting' of a case." United States v. Roberts, 548 F.2d 665, 667 (6th Cir.), cert. denied, 431 U.S. 920 (1977). A prior associational relationship between various defendants and witnesses is relevant and admissible in a conspiracy case.

The United States will also offer testimony that state search warrants were issued by various Marquette County judges ordering the search of Defendant Coe's residence at 346 Harrison Street in January 2000, and the residence he shared with his girlfriend, Lacey Setner, and Defendant Coe's business, the VIP Salon, in February 2004. This testimony will be offered to show how and why the police came to possess certain records and documents belonging to Defendant Coe and his co-conspirators. See Levy, 904 F.2d at 1030; United States v. Martin, 897 F.2d 1368 (6th Cir. 1990); Freeman, 816 F.2d at 563; Love, 767 F.2d at 1063.

**D.     Expert Testimony**.

During the course of this trial, the United States will offer expert testimony as to the identification of the controlled substances involved and other matters pertaining to drug trafficking. Rules 702 and 703 of the Federal Rules of Evidence govern testimony by expert witnesses. Those rules state:

Rule 702.  Testimony by Experts

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . .

Rule 703.  Bases of Opinion Testimony by Experts

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

In qualifying experts, Rule 702 is to be broadly construed.  United States v. Barker, 553 F.2d 1013 (6th Cir. 1977); Mannino v. Intern. Mfg. Co., 650 F.2d 846 (6th Cir. 1981).

> Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact.

Mannino, 650 F.2d at 851.

Courts have frequently permitted experienced drug investigators to testify regarding aspects of drug transactions that are unlikely to be within the knowledge of the average layman.  See United States v. Pugliese, 712 F.2d 1574, 1581-82 (2d Cir. 1983) (citing examples); United States v. Agyen, 842 F.2d 203 (8th Cir.), cert. denied, 486 U.S. 1035 (1988) (street value of heroin).  It is not improper to elicit such testimony from investigators who also testify as fact witnesses.  United States v. Young, 745 F.2d 733, 760 (2d Cir. 1984), cert. denied, sub nom. Myers v. United States, 470 U.S. 1084 (1985).

**E.    Admissibility of Plea Agreements.**

A jury is entitled to review the entire plea agreement between the United States and a witness in order to assess the credibility of the witness.  In this regard, the plea agreement itself is admissible in evidence during direct examination.  United States v. Townsend, 796 F.2d 158, 162 (6th Cir. 1986).

> [c]ourts have consistently recognized that "the elicitation of the fact of the agreement and the witness" understanding of it . . . should be permitted on direct examination in order to anticipate cross-examination by the defendant which might give the jury the unjustified impression that the government was concealing this relevant fact.  United States v. Edwards, 631 F.2d 1049, 1052 (2d Cir. 1980).  (Other citations omitted.)

Townsend, 796 F.2d at 162.

The Sixth Circuit and a majority of courts considering the issue have held the elicitation of a plea agreement containing a promise to testify truthfully does NOT constitute impermissible bolstering of the witness's credibility.  Townsend, 796 F.2d 158, at 163.  See United States v. Leslie, 759 F.2d 366, 378 (5th Cir. 1985), reversed on rehearing en banc on other grounds, 783 F.2d 541 (1986); United States v. Oxman, 740 F.2d 1298, 1302-1303 (3d Cir. 1984), vacated on other grounds, sub nom. 473 U.S. 922 (1985); United States v. McNeill, 728 F.2d 5, 14 (1st Cir. 1984); United States v. Winter, 663 F.2d 1120, 1133-34 (1st Cir. 1981), cert. denied, 460 U.S. 1011 (1983).

The United States will attempt to anticipate other potential issues that may arise and prepare memoranda of law on each issue for submission to the Court during trial.

Respectfully submitted,

MARGARET M. CHIARA
United States Attorney

Dated:  March 15, 2005       /s/ Brian P. Lennon
BRIAN P. LENNON
Assistant United States Attorney